IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LORENZ M. HOFMANN, Ph.D. and   §
LMH ASSOCIATES, INC.,   §
  §
    Plaintiffs,   §
  §
v.   §     CIVIL ACTION NO. H-03-5226
  §
ENDOVASC, LTD., INC.,   §
ENDOVASC, INC., DAVID P.   §
SUMMERS, Ph.D., and   §
M. DWIGHT CANTRELL,   §
  §
    Defendants.   §

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After all parties have rested and closed the evidence, and having heard and considered the arguments and authorities of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

## Agreed Findings of Fact

**The parties have mutually agreed to the following findings of fact, which the Court adopts except as noted in brackets:**

1. LMH Associates, Inc. ("Plaintiff") entered into Consulting Services Agreements ("CSA") with Endovasc, Ltd., Inc. Endovasc, Ltd., Inc. later merged and the resulting company was Endovasc, Inc. ("Defendant"). The parties have stipulated that for the purposes of this resulting litigation, Plaintiff and Defendant are the proper parties to the CSA.

2.    Defendant is a Nevada corporation authorized to do business in the State of Texas.

3.    On April 2, 2001, Plaintiff entered into a written Consulting Services Agreement ("CSA") with Defendant with a term of twelve months.

4.    On April 1, 2002, the parties entered into a written agreement extending the CSA for a term of six months.

5.    On April 17, 2002, the parties entered into a written agreement extending the CSA on a month to month basis.

6.    On October 1, 2002, the parties entered into a written agreement extending the CSA for three months through December 31, 2002.

7.    On January 1, 2003, the parties entered into a written agreement extending the CSA for two months through February 28, 2003.

8.    On March 1, 2003, the parties entered into a written agreement extending the CSA for one month through March 31, 2003.

9.    Under the CSA and its extensions in exchange for the consulting services of Plaintiff, Defendant agreed to pay a monthly retainer fee of $15,000 (75 hours @ $200/hour) payable upon receipt of an invoice and hours detail report and to reimburse Plaintiff for expenses.

10.   Plaintiff performed consulting services and incurred expenses under the CSA and the subsequent extension agreements.

2

Defendant was invoiced for these services, along with an "hours detail report."

11.  Plaintiff sent to Defendant hourly billings for work April 1, 2001, through March 31, 2003, totaling $700,300.

12.  Plaintiff sent to Defendant hourly billings for work between April 1, 2003, and April 30, 2003, totaling $5,650.

13.  Defendant made cash payments to Plaintiff in the sum of Ninety Thousand Dollars ($90,000.00) applied toward the hourly billings.

14.  Defendant issued to Plaintiff two hundred ninety-eight thousand five hundred (298,500) shares of Endovasc, Ltd. Inc. S-8 unrestricted stock as additional payments toward Plaintiff's hourly billings.

15.  The closing price per share of the Endovasc Ltd., Inc. S-8 stock issued to Plaintiff on the date it was issued is the price per share indicated on Defendant's Exhibit No. 3.

16.  Defendant issued to Plaintiff four million four hundred fifty-nine thousand eight hundred eighty-three (4,459,883) shares of Endovasc, Ltd., Inc. Rule 144 restricted stock. [Defendant issued 4,200,000 shares of original issue Rule 144 restricted shares before the 40/1 reverse split on July 9, 2002, and 259,883 new issue Rule 144 restricted shares after the 40/1 reverse split on July 9, 2002.]

17.  The price per share of the 144 restricted stock Endovasc, Ltd., Inc. issued to Plaintiff as indicated on Defendant's Exhibit

3

No. 3 was the average closing stock price based on the last week of the calendar quarter prior to the date of issuance of the stock. [These prices are irrelevant in light of the Court's construction of the CSA and Additional Findings of Fact below.]

18.  The price per share on Plaintiff's Trial Exhibit 210 under the column entitled "Sell Price 1/4 Earned" is the average closing stock price of the Endovasc, Ltd., Rule 144 restricted stock for the last five trading days of the month that is listed in the column titled "Date Price Calculation." [These prices are not adopted inasmuch as the Court finds that an average of the parties' stipulated prices as agreed in Plaintiff's Trial Exhibit 213 should be used.]

19.  The price per share on Plaintiff's Trial Exhibit No. 210 under the column entitled "Ave Sell Price" was the average closing stock price of the Endovasc, Ltd., Rule 144 restricted stock for the first five days of the month listed in the preceding column entitled "Est. Sell 14 months." [These prices are not adopted inasmuch as the Court finds that the average closing prices for the last five days of the month should apply, not the first five days.]

20.  On July 9, 2002, Endovasc, Ltd. stock was subjected to a 40/1 reverse split. [Thus, Endovasc issued one share of the new issue Rule 144 restricted stock in replacement of each 40 shares of the original Rule 144 restricted stock.]

21.  On March 31, 2003, Endovasc, Ltd. stock was subjected to a 6/5 forward split. [Thus, Endovasc issued six shares of the new issue Rule 144 restricted stock in replacement of each five shares of the new issue Rule 144 restricted shares already owned.]

22.  During the term of the agreements, Defendant, through its officers and employees, repeatedly promised to pay Plaintiff.

23.  Defendant, after the consulting services agreement with Plaintiff terminated, issued S-8 unrestricted stock to Plaintiff as payment toward Plaintiff's outstanding invoices.

## Additional Findings of Fact

From a preponderance of the evidence, the Court additionally finds as follows:

24.  The CSA provides that Defendant would be obligated to pay Plaintiff a monthly retainer fee of up to $15,000 per month (75 hours at $200/hour) in cash (the "cash portion of the CSA").  For the period from April 1, 2001 through termination of the CSA on March 31, 2003, Plaintiff was entitled to receive from Defendant the total sum of $350,200 under the cash portion of the CSA.

25.  Although the CSA provides that Defendant would be obligated to pay Plaintiff up to $15,000 monthly in cash, the parties orally agreed that Plaintiff would also accept "S-8" unrestricted stock as a credit against the accrued amounts owed under the cash portion of the CSA.  Specifically, the parties

agreed that Defendant would issue S-8 stock to Plaintiff, Plaintiff would sell the stock, and the net cash proceeds Plaintiff received for the stock, minus a 5% "administrative fee," would be credited against accrued amounts that Defendant owed to Plaintiff under the cash portion of the CSA.

26.   Plaintiff sold all 298,500 shares of S-8 stock that Defendant issued to Plaintiff in lieu of cash, for which Plaintiff realized $199,105 in net proceeds.   After deducting the agreed 5% administrative fee, or $9,955, Defendant was entitled to a credit of $189,150 on the accrued amounts that Defendant owed to Plaintiff under the cash portion of the CSA.

27.   After applying all credits for cash payments ($90,000) and for the proceeds derived from the sale of the S-8 unregistered stock ($189,150), the remaining balance due to be paid to Plaintiff by Defendant under the cash portion of the CSA is $71,050.00.

28.   Plaintiff never agreed to accept Rule 144 restricted stock as a credit against the amounts owed under the cash portion of the CSA.

29.   The CSA provides that services rendered by Plaintiff in excess of 75 hours per month would accrue in value at $200/hour and would be assessed by Defendant at the end of three-month intervals for compensation in either dollars or Rule 144 restricted shares of Defendant's stock, the option being Defendant's as to whether cash or restricted stock would be paid (the "restricted stock portion of the CSA").

6

30.   Defendant  elected  to  pay  amounts  owed  under  the restricted stock portion of the CSA in restricted stock, not cash.

31.   The CSA provides that if Defendant determines to issue restricted stock for the hours accrued under the restricted stock portion of the CSA, the amount of stock to be issued would be based on the average stock price for the "preceding week of the three-month review interval."

32.   Because hours accrued under the restricted stock portion of the CSA were to be assessed by Defendant at the end of the three-month intervals, the "preceding week" was the last week of each such three-month interval.

33.   Determination of the average stock price for the last week of a three-month interval requires examination of the last five trading days of the last month of each such three-month interval.

34.   The CSA does not expressly state when Defendant was required to issue any restricted stock that Defendant elected to pay Plaintiff in lieu of cash for amounts owed under the restricted stock portion of the CSA.  Because any such restricted stock was merely a substitute for the cash that otherwise was due and owing for the three month interval, however, the CSA impliedly required Defendant to issue the restricted stock within a reasonable time after Defendant assessed Plaintiff's hours at the end of each three-month interval.  One month is a reasonable time.

7

35.  A reasonable time from the date Defendant was to assess Plaintiff's hours (<u>i.e.</u>, the end of each three-month interval) to the date Plaintiff could have sold the restricted stock is 14 months, given the one month period reasonably allowed for Defendant to issue to Plaintiff the Rule 144 restricted shares, followed by the required one-year holding period, plus one additional month after the end of the holding period to allow Plaintiff a reasonable period of time to sell the restricted stock.

36.  The first three-month review interval encompassed the months of April, May, and June 2001, and ended on June 30, 2001. Thus, the first three-month review interval coincided with the second calendar quarter of 2001 and, likewise, the ensuing seven three-month review intervals were concurrent with the next seven calendar quarters.

37.  Applying the formula set forth in the restricted stock portion of the CSA, Defendant first should have assessed Plaintiff's hours for the first three-month interval, <u>i.e.</u>, the second quarter of 2001, which ended on June 30, 2001.  Through that date, Defendant owed to Plaintiff $87,200 (436 hours at $200/hour) under the restricted stock portion of the CSA.  The average stock price for the last trading week of June 2001 was $.066 per share. Thus, for Plaintiff's services rendered during the second quarter of 2001, Defendant should have issued to Plaintiff 1,321,212 shares of Rule 144 restricted stock ($87,200 divided by $.066) by July 31, 2001.

38.  If  Defendant  had  complied  with  the  restricted  stock portion  of  the  CSA  and  issued  to  Plaintiff  1,321,212  shares  of restricted  stock  within  a  reasonable  time  after  June  30,  2001, Plaintiff  could  have  sold  those  shares  by  August  31,  2002  (14 months  after  the  end  of  the  second  quarter,  2001),  and  obtained gross  proceeds  in  the  approximate  amount  of  $26,642.22  (30,030  new issue  Rule  144  shares  after  the  40/1  reverse  split  at  $.806  per share,  which  was  the  average  stock  price  for  the  last  trading  week of  August  2002).

39.  Applying  the  foregoing  formula  to  the  second  quarter, 2001,  and  to  each  successive  quarter,  results  in  the  following:

| Quarter | Assess. Date | Money Owed | Avg. Close Price | Shares Owed | Presumed 14-Month Sale Date | Converted Shares Available For Sale | Avg. Close Price | Approx. Gross Proceeds |
|---|---|---|---|---|---|---|---|---|
| 2nd Q. 2001 | 06/30/2001 | $87,200 | .066 | 1,321,212 | 08/31/2002 | 33,030* | .806 | $26,622.18 |
| 3rd Q. 2001 | 09/30/2001 | $63,200 | .0355 | 1,780,282 | 11/30/2002 | 44,507* | 1.62 | $72,101.34 |
| 4th Q. 2001 | 12/31/2001 | $78,350 | .1866 | 419,882 | 02/28/2003 | 10,497* | .828 | $8,691.52 |
| 1st Q. 2002 | 03/31/2002 | $70,450 | .0812 | 867,611 | 05/31/2003 | 26,028** | .485 | $12,623.58 |
| 2nd Q. 2002 | 06/30/2002 | $10,850 | .047 | 230,851 | 08/31/2003 | 6,926** | .37 | $2,562.62 |
| 3rd Q. 2002 | 09/30/2002 | $14,150 | .866 | 16,339* | 11/30/2003 | 19,607** | .306 | $5,999.74 |
| 4th Q. 2002 | 12/31/2002 | $7,550 | .836 | 9,031* | 02/29/2004 | 10,837** | .294 | $3,186.08 |
| 1st Q. 2003 | 03/31/2003 | $18,350 | .756 | 24,272** | 05/31/2004 | 24,272** | .169 | $4,101.97 |
| **TOTAL** | | | | | | | | **$135,889.03** |

\*  Reflects new issue Rule 144 shares after the 40/1 reverse split on July 9, 2002.
\*\*Reflects new issue Rule 144 shares after dilution by the 6/5 forward split on March 31, 2003.

40.  As demonstrated in the foregoing chart, if Defendant had timely delivered to Plaintiff the Rule 144 restricted shares to which Plaintiff was entitled, and if Plaintiff had timely sold those shares after the restriction expired, Plaintiff would have received $135,889.

41.  Defendant routinely failed within a reasonable time to issue to Plaintiff the restricted Rule 144 stock to which Plaintiff was entitled at the end of each three-month interval.  Instead, Defendant issued to Plaintiff 500,000 shares of original Rule 144 restricted stock on November 26, 2001; 300,000 shares of original Rule 144 restricted stock on April 19, 2002; 3,400,000 shares of original Rule 144 restricted stock on June 11, 2002; and 259,883 shares of new issue (after the 40/1 reverse split) Rule 144 restricted stock on March 28, 2003.

42.  Defendant's unreasonable delays in issuing to Plaintiff the restricted shares to which it was entitled necessarily delayed Plaintiff's ability to sell the shares which, in a declining market, resulted in its being damaged.

43.  Offsetting Plaintiff's damages from Defendant's delays in issuing shares, however, is Defendant's overpayment of restricted shares to Plaintiff on March 28, 2003.  The history of the restricted shares earned by Plaintiff, Defendant's delay in issuing to Plaintiff all shares earned up until March 28, 2003, and finally

10

Defendant's sizeable overpayment of restricted shares to Plaintiff
on March 28, 2003, are summarized in the following chart:

| Quarter | Number of Shares (owed) to Plaintiff by Defendant | Date by which shares should have been issued | Date Shares were actually issued | No. of shares actually issued | Total shares cumulatively (owed) or overpaid to Plaintiff |
|---|---|---|---|---|---|
| 2nd Q. 2001 | (1,321,212) | 07/31/01 | | | (1,321,212) |
| 3rd Q. 2001 | (1,780,282) | 10/31/01 | | | (3,101,494) |
| | | | 11/26/01 | 500,000 | (2,602,494) |
| 4th Q. 2001 | (419,882) | 01/31/02 | | | (3,021,376) |
| | | | 04/19/02 | 300,000 | (2,721,376) |
| 1st Q. 2002 | (867,611) | 04/30/02 | | | (3,588,987) |
| | | | 06/11/02 | 3,400,000 | (188,987) |
| 2nd Q. 2002 | (230,851) | 07/31/02 | | | (419,838) |
| | Restatement of past due original issue Rule 144 shares to reflect new issue Rule 144 shares due after the 40/1 reverse split on July 9, 2002:  419,838 original issue shares divided by 40 = 10,495 accrued new issue shares. | | | | (10,495)* |
| 3rd Q. 2002 | (16,339)* | 10/31/02 | | | (26,834)* |
| 4th Q. 2002 | (9,031)* | 01/31/02 | | | (35,865)* |
| | | | 03/28/03 | 259,883* | 224,018* |
| | Restatement of new issue Rule 144 shares--overpaid as of 03/28/03--to reflect dilution of the 6 for 5 forward split effective 03/31/03: 224,018 overpaid shares now equal 268,821 overpaid new issue Rule 144 shares after 03/31/03: | | | | 268,821** |
| 1st Q. 2003 | (24,272)** | 04/30/03 | | | 244,549** |

  * Reflects new issue Rule 144 shares after the 40/1 reverse split on July 9, 2002.
  ** Reflects new issue Rule 144 shares after dilution by the 6/5 forward split on March 31, 2003.


44.  By April 1, 2003, after dilution by the 6/5 forward split
effective March 31, 2003, Defendant overpaid Plaintiff in the
amount of 244,549 shares of new issue Rule 144 restricted stock.

Plaintiff sold all of this overpayment of shares and realized the gain.

45.   The Rule 144 holding periods for the four blocks of restricted stock actually issued to Plaintiff expired on November 26, 2002, April 19, 2003, June 11, 2003, and March 28, 2004, respectively, in each instance one year after each block of stock was issued.

46.   There is no evidence that any Rule 144 limitations would have precluded Plaintiff from selling its restricted shares between 12 and 13 months after it received them.

47.   If Plaintiff had sold all shares of the restricted stock actually issued to it by Defendant within one month after the twelve months Rule 144 holding periods expired, Plaintiff would have realized gross proceeds from the sales in the following approximate amounts:

| Date Shares Were Actually Issued | Number of Shares Actually Issued | Approx. Date By Which Shares Could Have Been Sold | Converted Shares at Time of Assumed Sale Date | Average Closing Price | Approx. Gross Proceeds |
|---|---|---|---|---|---|
| 11/26/2001 | 500,000 | 12/26/2002 | 12,500* | .87 | $10,875.00 |
| 04/19/2002 | 300,000 | 05/19/2003 | 9,000** | .504 | $ 4,536.00 |
| 06/11/2002 | 3,400,000 | 07/11/2003 | 102,000** | .346 | $35,292.00 |
| 03/28/2003 | 259,883* | 04/28/2004 | 311,860** | .268 | $83,578.48 |
| **TOTAL** | | | | | $134,281.48 |

* Reflects new issue Rule 144 shares after the 40/1 reverse split on July 9, 2002.
** Reflects new issue Rule 144 shares after dilution by the 6/5 forward split on March 31, 2003.

48.  Thus, while Plaintiff could have realized approximately $135,889 if Defendant had timely issued to Plaintiff the restricted shares earned and if Plaintiff had timely sold all of the restricted shares (Findings of Fact Nos. 39, 40), Plaintiff had within its power to realize $134,281 by timely selling all of the restricted shares--including the overpaid shares--that Plaintiff actually did receive from Defendant (Finding of Fact No. 47).  The resulting difference of less than $2,000 is *de minimis* given the variable dates of up to a month allowed for Plaintiff to sell its shares under both hypotheses.

49.  Defendant's overpayment of 244,548 new issue restricted shares to Plaintiff, and Plaintiff's damages from Defendant's previous delays in issuing restricted shares that were due, is a substantially even offset.  In other words, if Defendant had not unreasonably delayed issuing the Rule 144 shares to Plaintiff, Plaintiff could have realized approximately $135,000 by timely selling the shares after the restrictions expired; and given Defendant's overpayment of 248,548 new issue Rule 144 shares, which Plaintiff accepted, kept, and sold, Plaintiff had it within its power to realize approximately $135,000 if it had only sold each of the four blocks of Rule 144 shares within one month after the restrictions expired.

13

50.  Plaintiff is entitled to no delay damages from Defendant and Defendant is entitled to no recovery from Plaintiff for the overpayment of restricted shares.

51.  After the 40/1 reverse split and 6/5 forward split, Plaintiff did not request from Defendant and Defendant did not deny to Plaintiff authorization to sell Plaintiff's Rule 144 stock at the expiration of the one-year Rule 144 restriction periods measured from the dates of original issuance, which one-year restricted periods ended on November 26, 2002, April 19, 2003, June 11, 2003, and March 28, 2004, respectively.

52.  The 40/1 reverse stock split and 6/5 forward stock split, which resulted in the reissuance of new certificates to Plaintiff and to all other shareholders to reflect the correct numbers of shares after the splits, did not delay or prevent Plaintiff from selling its restricted shares one year after the original shares had been issued to Plaintiff.

53.  The shortfall between the proceeds that Plaintiff could have derived from selling all of its restricted shares within a month after the expirations of the one-year holding periods that ended on November 26, 2002, April 19, 2003, June 11, 2003, and March 28, 2004, respectively--approximately $135,000 (Findings of Fact Nos. 47, 48, 49)--and the $93,145 that Plaintiff did realize when it finally did sell the shares, is entirely attributable to Plaintiff's own delays in making those sales, evidently in part

14

based on Plaintiff's mistaken belief that it was restricted from selling for a full year after reissuance of new stock certificates to reflect the 40/1 reverse stock split and 6/5 forward stock split.

54. Defendant is not responsible or liable to Plaintiff for the foregoing shortfall Plaintiff sustained from Plaintiff's own delays.

55. Plaintiff is not entitled to compensation for services performed or expenses incurred after March 31, 2003.

56. Neither Defendant nor any of its employees made a promise of future performance to Plaintiff without the intention of performing any such promise.

57. Defendant did not commit fraud against Plaintiff.

58. Plaintiff did not breach the CSA, either by failing to develop a usable protocol or in any other respect.

59. Plaintiff is entitled to recover from Defendant the sum of $71,050, the unpaid portion of the cash obligation of the CSA that was breached by Defendant.

60. Plaintiff is entitled to prejudgment interest on the sum of $71,050 from the date this suit was filed to the date of judgment.

61. Plaintiff is entitled to recover its reasonable and necessary attorney's fees incurred in connection with the foregoing recovery of damages.

**Agreed Conclusions of Law**

1.    LMH Associates, Inc. entered into Consulting Services Agreements ("CSA") with Endovasc, Ltd., Inc.  Endovasc, Ltd., Inc. later merged and the resulting company was Endovasc, Inc. ("Defendant").  The parties have stipulated that for the purposes of this resulting litigation, Plaintiff and Defendant are the proper parties to the CSA.

2.    This Court has jurisdiction of the parties and of the subject matter of this case.

3.    When two corporations merge, the surviving corporation assumes the rights and liabilities of each of the merging corporations.  TEX. BUS. CORP. ACT ANN. art. 5.06, § A(1) (Vernon Supp. 2002); Columbia/HCA Healthcare Corp. v. Cottey, 72 S.W.3d 735, 749 (Tex. App.--Waco 2002, no pet.).

4.    The elements of a breach of contract claim are: (1) a valid, enforceable contract; (2) the plaintiff performed, tendered performance, or was excused from performing its contractual obligations; (3) the defendant breached the contract; and (4) the defendant's breach caused the plaintiff injury.  McLaughlin, Inc. v. Northstar Drilling Techs., 138 S.W.3d 24, 27 (Tex. App.--San Antonio 2004, no pet.).

5.    The elements of a cause of action for common-law fraud are: (1) the defendant made a material representation to the plaintiff; (2) the representation was false; (3) when the defendant

16

made the representation, the defendant either knew the representation was false or made the representation recklessly, as a positive assertion, and without knowledge of its truth; (4) the defendant made the representation with the intent that the plaintiff act on it; (5) the plaintiff relied on the representation; and (6) the representation caused the plaintiff injury.  In re FirstMerit Bank, 52 S.W.3d 749, 758 (Tex. 2001).

6.   A fraud claim based on a false promise of future performance is actionable as a false representation.  Columbia/HCA Healthcare Corp. v. Cottey, 72 S.W.3d 735, 744 (Tex. App.--Waco 2002, no pet.).  A false promise of future performance is proven by showing the defendant made the promise with no intention of performing it.  Spoljaric v. Percival Tours, 708 S.W.2d 432, 434 (Tex. 1986).   Slight circumstantial evidence of fraud, when considered along with a breach of a promise to perform is enough to find intent not to perform.  Spoljaric, 708 S.W.2d at 435.

7.   A plaintiff can recover exemplary damages in an action for common-law fraud.  TEX. CIV. PRAC. & REM. CODE § 41.003(a).

8.   An employer may be vicariously liable for the fraudulent acts of its employee if the employee was acting in the course and scope of his employment.  NationsBank, N.A. v. Dilling, 922 S.W.2d 950, 953-54 (Tex. 1996).

## Additional Conclusions of Law

9.   Under Texas law, a court's primary objective in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument.   *See* Gonzalez v. Denning, 394 F.3d 388, 392 (5th Cir. 2004); J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003).   To accomplish this objective, courts "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." J.M. Davidson, 128 S.W.3d at 229; *see also* Denning, 394 F.3d at 392.

10.   The terms used in the contract should be accorded their plain, ordinary meaning, unless the contract itself shows that the parties intended otherwise.   *See* Denning, 394 F.3d at 392; Am. Nat'l Gen. Ins. Co. v. Ryan, 274 F.3d 319, 323 (5th Cir. 2001). "Technical words and terms in a contract are to be construed by the courts as those terms are usually understood by persons in the profession or business to which the terms relate, unless it is clear the terms were used in a different sense." Burke v. Union Pac. Res. Co., 138 S.W.3d 46, 63 (Tex. App.--Texarkana 2004, pet. denied). "Words used in one sense in one part of a contract are, as a general rule, deemed to have been used in the same sense in another part of the instrument, where there is nothing in the

18

context to indicate otherwise." <u>Gonzales v. Mission Am. Ins. Co.</u>, 795 S.W.2d 734, 736 (Tex. 1990).

11.   "'If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous.'" <u>Denning</u>, 394 F.3d at 392 (quoting <u>Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.</u>, 907 S.W.2d 517, 520 (Tex. 1995)). "On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." <u>J.M. Davidson</u>, 128 S.W.3d at 229. However, "'[a] contract is not ambiguous merely because the parties to an agreement proffer conflicting interpretations of a term.'" <u>Denning</u>, 394 F.3d at 392 (quoting <u>Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines</u>, 278 F.3d 494, 497 (5th Cir. 2002)).

12.   The CSA is not ambiguous.

13.   Defendant breached the CSA by failing to pay Plaintiff all sums due under the cash portion of the CSA and by failing timely to pay Plaintiff all shares of Rule 144 stock due under the restricted stock portion of the CSA.

14.   Plaintiff did not breach the CSA.

15.   "Determining the proper method for measuring damages is a question of law for the court." <u>Walden v. Affiliated Computer Servs., Inc.</u>, 97 S.W.3d 303, 328 (Tex. App.--Houston [14th Dist.] 2003, pet. denied).

16.   "The ultimate goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach." <u>Walden</u>, 97 S.W.2d at 328.

17.   Plaintiff suffered quantifiable damages in the amount of $71,050 as a result of Defendant's breach of the cash portion of the CSA, the difference between the amount required to be paid to Plaintiff under the CSA and the amount that Defendant did pay to Plaintiff.

18.   When calculating damages related to a failure timely to deliver restricted stock, the proper measure of damages is the difference between (1) the market value of the restricted stock on the date the plaintiff could reasonably have expected to sell it if the defendant had delivered it on time and (2) the market value of the restricted stock actually delivered to the plaintiff on the date the plaintiff could reasonably have expected to sell it. *See* <u>Schwartz v. NMS Indus., Inc.</u>, 575 F.2d 553, 555-56 (5th Cir. 1978); <u>Schwartz v. NMS Indus., Inc.</u>, 517 F.2d 925, 931 (5th Cir. 1975); *cf*. <u>Keane v. Futuresat Indus., Inc.</u>, No. 85 Civ. 8658, 1990 WL 102235, at *2-3 (S.D.N.Y. July 10, 1990).

19.   Pursuant to subsection (d) of 17 C.F.R. § 230.144 ("Rule 144"), the holding period for restricted securities is one year from the date of the acquisition of the securities from the issuer. 17 C.F.R. § 230.144(d)(1). "Securities acquired from the issuer as

a dividend or pursuant to a stock split, reverse split, or recapitalization shall be deemed to have been acquired at the same time as the securities on which the dividend or, if more than one, the initial dividend was paid, the securities involved in the split or reverse split, or the securities surrendered in connection with the recapitalization." Id. § 230.144(d)(3)(i).

20. The damages sustained by Plaintiff as a result of Defendant's breach of the restricted stock portion of the CSA are offset by amounts that Plaintiff could have recovered by making timely sales of the restricted shares that Defendant overpaid to Plaintiff.

21. Because of the offset, Plaintiff is entitled to no recovery of damages claimed from Defendant's unreasonable delays in issuing restricted shares to Plaintiff, and Defendant is entitled to no recovery of damages claimed from Plaintiff based on its overpayment of restricted shares to Plaintiff.

22. The March 1, 2003, CSA expired by its terms on March 31, 2003, and was not renewed.  Thus, Plaintiff is not entitled to recover any compensation for services rendered by Plaintiff after March 31, 2003, under the March 1, 2003, CSA.

23. The April 17, 2002, CSA was superseded by the parties' October 1, 2002, CSA.  Thus, the April 17, 2002, CSA was not in effect when Defendant informed Plaintiff on April 29, 2003, that Defendant no longer required Plaintiff's consulting services.

Defendant did not breach the April 17, 2002, CSA by not giving to Plaintiff a two-week written notice of Defendant's intent to cancel the April 17, 2002, CSA, and Plaintiff is entitled to recover no compensation under the April 17, 2002, CSA for any services rendered after March 31, 2003.

24.   Plaintiff has not pleaded a cause of action for quantum meruit in its First Amended Complaint and is not entitled to recover in quantum meruit for any services rendered after March 31, 2003.

25.   Where jurisdiction is predicated upon diversity of citizenship, state law governs the rate of prejudgment interest. Boston Colony Ins. Co. v. Tiner Assocs., Inc., 288 F.3d 222, 234 (5th Cir. 2002).   "Texas common law allows prejudgment interest to accrue at the same rate as postjudgment interest on damages awarded for breach of contract."   Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines, 278 F.3d 494, 500 (5th Cir. 2002).   The rate of postjudgment interest is determined by the Consumer Credit Commissioner in accordance with Tex. Fin. Code. Ann. § 304.003(c) (Vernon Supp. 2005).

26.   Under Texas common law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date the defendant receives a written notice of a claim, or (2) the date suit is filed, and is computed as simple interest.   Johnson & Higgins of

Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 531 (Tex. 1998).

27. Because this is a diversity case, Plaintiff is entitled to prejudgment interest under Texas law. Such interest will accrue from November 13, 2004, the date Plaintiff filed this suit.

28. Plaintiff is entitled to recover from Defendant breach of contract damages in the amount of $71,050, plus prejudgment interest from November 13, 2004, to the date of judgment, plus reasonable attorney's fees and expenses.

29. If any of the foregoing findings of fact constitute conclusions of law, they are adopted as such; and if any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

The Clerk shall notify all parties and provide them with a true copy of these Findings of Fact and Conclusions of Law.

SIGNED at Houston, Texas, on this 18th  day of April, 2006.


EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE